UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

RISHI K. GUPTA,                                           :

                                    *Plaintiff,*         :          19-cv-_____(____)

                    *- against -*                        :

NEW SILK ROUTE ADVISORS, L.P.,                           :
NEW SILK ROUTE PARTNERS, LTD.,
          (the "Employer Defendants")                   :

PARAG SAXENA,                                            :
          ("Saxena")                                             **COMPLAINT**
                                                         :
NEW SILK ROUTE PE ASSOCIATES, L.P.,                     :
NEW SILK ROUTE PE ASIA FUND-A, L.P.,                    :
NEW SILK ROUTE PE ASIA FUND, L.P.,
NEW SILK ROUTE HOLDINGS, LLC,                           :
          (the "Entity Control Defendants")
                                                         :
NEW SILK ROUTE MAURITIUS
          ADVISORS, LLC,                                :          **JURY TRIAL DEMANDED**
ARDUINO HOLDINGS LIMITED,                                        **FOR**
INGAIN TRADERS LLC,                                     :          **ALL ISSUES SO TRIABLE**
SOUTH ASIA GASTRONOMY
          ENTERPRISES, LLC,                             :
ORISEN MEDTECH LIMITED,
A H HOLDINGS (BVI) LIMITED, and                         :
A H HOLDINGS S.A.R.L.,
          (the "Relief Defendants"),                    :

                    *Defendants.*                       :

------------------------------------------------------------------ X

          Plaintiff Rishi K. Gupta ("Plaintiff" or "Gupta"), for his Complaint against the above-

named Defendants, alleges the following on information and belief, except for paragraphs 2-6, 8,

12, 31-35, 39-48, 51, 54, 55, 58, 65-70, 72, 74, 82, 83, 85-94, 99-102, which are alleged on

personal knowledge, as follows:

## NATURE OF THE ACTION

1.      This action is brought under the whistleblower protection provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, codified at Section 21F(6)(h) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78u-6(h) ("Dodd-Frank").

2.      Gupta was the chief compliance officer ("CCO") and chief financial officer ("CFO") of Defendant New Silk Route Advisors, LP ("NSR Advisors"), an investment advisor registered with the U.S. Securities and Exchange Commission (the "SEC") under the Investment Advisers Act of 1940.  Gupta was also the corporate secretary of NSR Advisor's general partner, Defendant New Silk Route Partners, Ltd. ("NSR Partners") (NSR Advisors and NSR Partners are referred to collectively as the "Employer Defendants").

3.      NSR Partners was the ultimate general partner of all the other entity defendants named in this Complaint.  The entire business structure over which NSR Partners presided (the "NSR Funds") comprised over a dozen investment funds and special purpose vehicles that collectively held or to which investors had committed, at the times here relevant, assets under management of approximately $1.3 billion.

4.      NSR Partners was controlled by Defendant Parag Saxena ("Saxena").  NSR Partners, in turn, directly or indirectly controlled the actions of the Entity Control Defendants identified in this Complaint, who in their turn controlled the actions of the Relief Defendants. Gupta was a director of each of the Relief Defendants.

5.      In the months and years prior to January 2017, Gupta reported what he reasonably believed to be violations of federal securities law by NSR Advisers (and by extension

the NSR Funds) to Saxena and his close confidants Andrew Dworkin ("Dworkin") and Margaret Riley ("Riley").  Dworkin and Riley were long-time close confidants of Saxena, and their livelihood depended on his good will.  Saxena, aided and assisted by Dworkin and Riley, failed and refused to take corrective action or to self-report the violations to the SEC, and instead attempted to silence Gupta and impede his ability to fully perform his duties as CCO and CFO of NSR Advisors and the NSR Funds.

6.      Facing resistance from Saxena, Dworkin and Riley, Gupta then reported the information to the SEC by filing several Form TCRs with the SEC's Whistleblower Office beginning in March 2016.  Those TCRs were significant to SEC investigations that ultimately led to two administrative sanctions against NSR Advisors, the first on December 14, 2016 (*In the Matter New Silk Route Advisors, L.P.*, SEC Admin. Proc. No. 3-17722 (Dec. 14, 2016)) (the "2016 SEC Order"), and the second on July 17, 2018 (*In the Matter New Silk Route Advisors, L.P.*, SEC Admin. Proc. No. 3-18599 (July 17, 2018)) (the "2018 SEC Order").  Both SEC Orders substantiated Gupta's concerns of Securities Law violations that he reported to the SEC.

7.      Meanwhile, Saxena, Dworkin and Riley had grown suspicious of Gupta and accused him of disloyalty for his insistence on good compliance.  They retaliated against him personally by publicly harassing and denigrating him within the offices, and by hampering his ability to function as CCO.  Saxena further caused NSR Partners and NSR Advisors to retaliate against him by failing to compensate him at market rates of pay.  The SEC's second examination, which began in December 2016 and focused on conduct that Saxena had expressly ordered Gupta *not* to report to the SEC, convinced Saxena, Dworkin and Riley that Gupta was a whistleblower—and thus a traitor in their midst.

8.      Saxena, acting directly and through Dworkin and Riley, and through his direct

and indirect control of the Employer Defendants and the Entity Control Defendants, finally effected the ultimate retaliation against Gupta by firing him on January 5, 2017.  This occurred two months after Saxena, Dworkin and Riley learned that as part of his compliance function, Gupta routinely reviewed their emails, and one month after the SEC began its second investigation of NSR Advisors based directly on Gupta's whistleblower information.  Defendants terminated Gupta's employment as CCO of NSR Advisors and as corporate secretary of NSR Partners, and removed him as a director of each of the Relief Defendants.  In doing so, they deprived Gupta of his livelihood.  Being over 65 years old, and now professionally tainted by the SEC sanctions against NSR Advisors while Gupta was its CCO, Gupta has not and is not likely to find comparable employment elsewhere.

9.      By their retaliation, the Defendants violated Dodd-Frank's anti-retaliation provisions and damaged Gupta.

## JURISDICTION AND VENUE

10.      Federal district court jurisdiction is proper pursuant to 28 U.S.C. § 1331 and section 21F(h)(B)(i) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78u-6(h)(B)(i).

11.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants' principal place of business is in this district.  Venue is also proper because a substantial part of the events or omissions giving rise to the claims in this action occurred in this judicial district.

## PARTIES

### A.      Plaintiff

12.      Plaintiff Rishi K. Gupta ("Plaintiff" or "Gupta") resides in this district.  Gupta is

a senior accounting and finance professional.  He has a Master in Business Administration, and is licensed as a Certified Public Accountant in New York State.  Before becoming involved with the NSR Funds, he worked for several large international accounting firms such as Ernst & Young, LLP ("E&Y") and served as chief financial officer for several firms, with particular expertise in the development of growth stage companies.  At all times here relevant, Gupta served as the CCO and CFO of NSR Advisors, as the corporate secretary of NSR Partners, and as a director of each of the Relief Defendants.  Because of the central role of NSR Advisors with respect to all the NSR Funds, Gupta was the *de facto* CCO and CFO of the entire enterprise.

### B.     The Employer Defendants

13.     Defendant New Silk Route Advisors, L.P. ("NSR Advisors"), is a Cayman Islands exempted limited partnership.  It was formed at or about the same time as the NSR Funds to be the primary management company for the NSR Funds.  Now and at all times here relevant it has maintained its principal place of business in this district.  Since March, 2012, NSR Advisors has been registered with the SEC as an investment adviser (an "RIA").  Saxena is the Chief Executive Officer ("CEO") of NSR Advisors.  Until his termination on January 5, 2017, Gupta was the CCO and CFO of NSR Advisors.

14.     Defendant New Silk Route Partners, Ltd. ("NSR Partners") is a Cayman Islands exempted corporation.  NSR Partners is controlled by Saxena.  NSR Partners is the general partner, and therefore the controlling person, of NSR Advisors.  Now and at all times here relevant it has maintained its principal place of business in this district.  Until his termination on January 5, 2017, Gupta was the corporate secretary of NSR Partners and, by virtue of his position with NSR Advisors, its *de facto* CCO and CFO.

**C.      Saxena**

15.      Defendant Parag Saxena ("Saxena") resides in this district.  Saxena is the principal and controlling owner of NSR Partners, with 43.5% ownership.

**D.      The Entity Control Defendants**

16.      Defendant New Silk Route PE Associates, L.P. ("NSR PE Associates"), is a Cayman Islands exempted limited partnership.  Now and at all times here relevant it has maintained its principal place of business in this district.  NSR PE Associates is directly controlled by NSR Partners, and it in turn directly controls Defendants New Silk Route PE Asia Fund, L.P. and New Silk Route PE Asia Fund-A, L.P.  By virtue of his position with NSR Advisors, Gupta was NSR PE Associates' *de facto* CCO and CFO.

17.      Defendants New Silk Route PE Asia Fund, L.P., and New Silk Route PE Asia Fund-A, L.P. (the "NSR PE Asia Funds") are Cayman Islands exempted limited partnerships. They are both private equity funds, formed in or about December 2006.  Now and at all times here relevant they have maintained their principal place of business in this district.  The NSR PE Asia Funds are controlled by NSR PE Associates, and they in turn directly control Entity Control Defendant NSR Holdings, LLC, and Relief Defendants Arduino Holdings Limited, InGain Traders LLC, AH Holdings (BVI) Limited and AH Holdings S.a.r.l.  By virtue of his position with NSR Advisors, Gupta was the NSR PE Asia Funds' *de facto* CCO and CFO.

18.      Defendant NSR Holdings, LLC ("NSR Holdings"), is a Mauritius limited liability company.  Now and at all times here relevant it has maintained its principal place of business in this district.  NSR Holdings is controlled by the NSR PE Asia Funds, and it in turn directly controls Relief Defendants South Asia Gastronomy Enterprises, LLC and Orisen MedTech

Limited.  By virtue of his position with NSR Advisors, Gupta was NSR Holdings' *de facto* CCO and CFO

### E.     The Relief Defendants

19.     Defendant New Silk Route Mauritius Advisors, LLC, is a Mauritius limited liability company that is controlled by NSR Advisors.  It is licensed as an investment manager by the Mauritius Financial Services Commission, which permits it to operate as an investment advisor in certain jurisdictions outside the United States.  Now and at all times here relevant it was operated and managed by NSR Advisors and NSR Partners from this district.  Until he was terminated on January 5, 2017, Gupta was a Director of this Relief Defendant and, by virtue of his position with NSR Advisors, its *de facto* CCO and CFO.

20.     Defendant Arduino Holdings Limited is a Cyprus corporation or limited liability company that is controlled by the NSR PE Asia Funds.  Now and at all times here relevant it was operated and managed by NSR Advisors and NSR Partners from this district.  Until he was terminated on January 5, 2017, Gupta was a Director of this Relief Defendant and, by virtue of his position with NSR Advisors, its *de facto* CCO and CFO.

21.     Defendant InGain Traders LLC is a Mauritius limited liability company that is controlled by the NSR PE Asia Funds.  It is licensed by the Government of India as a foreign institutional investor and is able to trade listed equities on Indian stock exchanges.  Now and at all times here relevant it was operated and managed by NSR Advisors and NSR Partners from this district.  Until he was terminated on January 5, 2017, Gupta was a Director of this Relief Defendant and, by virtue of his position with NSR Advisors, its *de facto* CCO and CFO.

22.     Defendant South Asia Gastronomy Enterprises, LLC, is a Mauritius limited

liability company that is controlled by NSR Holdings.  Now and at all times here relevant it was operated and managed by NSR Advisors and NSR Partners from this district.  Until he was terminated on January 5, 2017, Gupta was a Director of this Relief Defendant and, by virtue of his position with NSR Advisors, its *de facto* CCO and CFO.

23.     Defendant Orisen MedTech Limited is a Mauritius corporation that is controlled by NSR Holdings.  Now and at all times here relevant it was operated and managed by NSR Advisors and NSR Partners from this district.  Until he was terminated on January 5, 2017, Gupta was a Director of this Relief Defendant and, by virtue of his position with NSR Advisors, its *de facto* CCO and CFO.

24.     Defendant AH Holdings (BVI) Limited is a British Virgin Islands corporation that is controlled by the NSR PE Asia Funds.  Now and at all times here relevant it was operated and managed by NSR Advisors and NSR Partners from this district.  Until he was terminated on January 5, 2017, Gupta was a Director of this Relief Defendant and, by virtue of his position with NSR Advisors, its *de facto* CCO and CFO.

25.     Defendant AH Holdings S.a.r.l. is a Luxembourg corporation that is controlled by the NSR PE Asia Funds.  Now and at all times here relevant it was operated and managed by NSR Advisors and NSR Partners from this district.  Until he was terminated on January 5, 2017, Gupta was a Director of this Relief Defendant and, by virtue of his position with NSR Advisors, its *de facto* CCO and CFO.

26.     Each of the Relief Defendants is named in this action solely because Gupta held a position of rank in each, which he lost by virtue of the retaliation here complained of, and to which positions he is entitled to be reinstated as an element of complete relief.

F.      **Riley and Dworkin**

27.      Riley has been a close associate of Saxena for more than 25 years.  By virtue of
her close association with Saxena, Riley acted as a *de facto* superior to Gupta.  Riley is the CFO
and CCO of Vedanta Management L.P. ("Vedanta Management"), another RIA controlled by
Saxena.  Riley became the CCO and CFO of NSR Advisors after Gupta's termination.  Riley
conspired with and aided and assisted Saxena in retaliating against Gupta.

28.      Dworkin is an attorney-at-law, acted as internal general counsel to the NSR Funds
and the general partner or manager of Vedanta Capital LLC, the limited partner of Vedanta
Management.  He has been a close associate of Saxena for more than 20 years.  By virtue of his
close association with Saxena, Dworkin acted as a *de facto* superior to Gupta.  Dworkin
conspired with and aided and assisted Saxena in retaliating against Gupta.

## PLAINTIFF'S ALLEGATIONS OF FACTS

A.      **The Business of the NSR Funds**

29.      The NSR Funds were founded in or about December 2006 by Saxena, along with
Raj Rajaratnam, Rajat Gupta (no relation to Plaintiff), Anil Kumar, Mark Schwartz, Abdul
Hafeez Shaikh (Finance Minister of Pakistan) and Victor Menezes (a former Senior Vice
Chairman of Citigroup).  Over time, several founding partners left the NSR Funds, leaving, at the
times here relevant, Saxena with virtually unfettered control over the NSR Funds.

30.      The NSR Funds invest primarily in growth stage companies located on or doing
business in the Indian Sub-continent.  Since the inception of the NSR Funds, its investors, which
include pension funds, insurance companies, large institutional investors, high net worth
individuals, and sovereign wealth funds, among others, have invested or committed to invest

over $1.3 billion.  These assets are ultimately controlled by Saxena.  NSR Advisors is responsible to ensure that all the NSR Funds are in regulatory compliance.  Accordingly, Gupta, as CCO and CFO of NSR Advisors, was the *de facto* CCO and CFO of the entire business comprised in the NSR Funds.

**B.    Gupta's Involvement With the NSR Funds**

31.    In November 2007, Gupta was hired as a consultant by Vedanta Capital LLC. Among other things, Vedanta Capital LLC performed certain back-office services for NSR Advisors.  In that capacity, Gupta developed the books and records of NSR Advisors and structured its operation for managing investments of the NSR Funds in entities in India and elsewhere through Mauritius. Gupta was also involved in ensuring the existence of proper advisory and sub-advisory agreements for NSR Advisors.  Gupta also prepared the accounting books for NSR Advisors and its affiliated entities, compiling year-to-date financial data for NSR Advisors and the NSR Funds, and developing projections for NSR Advisors and the NSR Funds. Notwithstanding his official status as a consultant to Vedanta Capital LLC, from his first day Gupta was presented to the outside world as the CFO of NSR Advisors and was given business cards with his title as the CFO.  And, in July 2008 his business cards were changed showing his title to be the Chief Operating Officer of NSR Advisors because, he was told, that Saxena thought of Gupta as the Chief Operating Officer of NSR Advisors.

32.    Based on his strong performance as a consultant, in April 2009, Saxena asked Gupta to become officially an employee of NSR Advisors.  To lure plaintiff to join NSR Advisors, Saxena said to him "stick with me, you will make millions."  Gupta accepted Saxena's offer and became an employee of NSR Advisors and its first official CFO in April 2009.

33.    In March 2011, Gupta was appointed corporate secretary of NSR Partners. Thereafter, Gupta was also appointed a director of the Relief Defendants.  Gupta was appointed to those capacities to replace founder Rajat Gupta.  Rajat Gupta had left the NSR Funds after having been charged with criminal insider trading as set forth below.

34.    In March 2012, when NSR Advisors registered as an investment advisor with the SEC, Gupta was also appointed CCO of NSR Advisors.  Gupta was chosen because he was seen as the only high-ranking insider with the experience, credentials and personal integrity to insulate Saxena and the NSR Funds from the Galleon Hedge Fund insider trading scandal surrounding co-founders Raj Rajaratnam, Rajat Gupta and Anil Kumar.  All three had been arrested for insider trading.  Kumar pled guilty and became a government witness, and by March 2012, Rajaratnam had been convicted and was incarcerated; Rajat Gupta would be convicted and sent to jail just three months later, in July 2012.  Meanwhile, Victor Menezes had been sued for insider trading by the SEC in 2006.  Saxena himself had been sanctioned by the SEC in 1994.

35.    Given the concern that the pending criminal cases against two of its founders and Menezes' and Saxena's past run-ins with the SEC would make the NSR Funds particularly subject to scrutiny by the SEC, Gupta understood that he needed a heightened vigilance to ensure that compliance was taken seriously at the NSR Funds.  Gupta understood not only that the NSR Funds needed to be run lawfully, but also that he himself would be held legally accountable if the NSR Funds broke the law on his watch.  That understanding informed how Gupta approached his responsibilities as CCO.

C.    **Gupta Establishes a Compliance Program for NSR Advisors**

36.    NSR Advisors was required to register as an investment advisor by Dodd-Frank,

which mandates, under certain circumstances, that advisers of private equity funds register with the SEC, and comply with the Investment Advisers Act of 1940, among other securities laws and regulations. Accordingly, in March 2012, NSR Advisors, along with its affiliated investment advisors, registered with the SEC as RIAs.

37.     As an RIA, NSR Advisors was required to comply with the SEC's Rule 206(4)-7 (the "Compliance Rule") which mandates that registered investment advisers take certain steps to avoid securities law violations. These steps include: (a) adopting and implementing written compliance policies and control procedures, (b) designating a chief compliance officer who is responsible for administering those policies and procedures, and (c) reviewing the policies and procedures annually for adequacy and the effectiveness of their implementation. Failure to maintain a compliance program in compliance with the Advisers Act is in itself a violation.

38.     NSR Advisors was also required to comply with the SEC's Rule 204A-1 ("the Code of Ethics Rule"), which requires that a registered adviser adopt a code of ethics setting forth the standards of business conduct expected of the adviser's officers and managers, among others, including their personal securities transactions. The code of ethics must include: (a) a standard of business conduct reflecting the adviser's and its supervised persons' fiduciary obligations; (b) the requirement that all staff comply with the federal securities laws; and (c) the requirement that supervised persons report to the CCO any violations of the code of ethics.

39.     Pursuant to these requirements, Gupta implemented a compliance program for NSR Advisors and all its affiliated advisers rendering management services to the NSR Funds, effective as of May 18, 2012, and entitled "Investment Adviser Compliance Program" (the "Compliance Program"). The Compliance Program provided that each adviser's CCO is "responsible for administering this Program for each Adviser" and that "[e]ach Adviser has

designated Rishi Gupta as CCO." Section I. The Compliance Program states that "ultimate

responsibility for overseeing compliance by an Adviser and its NSR Supervised Persons rests

with the CCO." Section XIV(A).

40.      NSR Advisors' Compliance Program notes that "[e]ach Adviser and its NSR

Supervised Persons are subject to numerous laws and regulation, including the Federal Securities

Laws (as defined herein)." Section I. "Federal Securities Laws" is defined in the Compliance

Program as:

> [T]he Securities Act, the Exchange Act, the Investment Company Act, the
> Advisers Act, Title V of the GLBA, the Sarbanes-Oxley Act of 2002, the Dodd-
> Frank Wall Street Reform and Consumer Protection Act, any rules adopted by
> the SEC under any of these statutes, the Bank Secrecy Act of 1970, as amended,
> as it applies to private funds and registered investment advisers, and any rules
> adopted thereunder the by SEC or the U.S. Department of the Treasury.

*Id.*

41.      The Compliance Program further noted that "[u]nder the Advisers Act, an

investment adviser owes a fiduciary duty to its clients (in NSR's case, the NSR Funds). This

duty requires the adviser to act in the best interest of its clients and to disclose conflicts of

interest, and in certain instances, to obtain client consent to conflict situations." *Id.* The

Compliance Program further noted that "NSR Supervised Persons should adhere to a high

standard of conduct consistent with each Adviser's fiduciary duties to clients and be sensitive to

situations that may present a direct or indirect conflict with a client." *Id.* NSR Supervised

Persons were defined as "any partner, officer, director, manager (or other person occupying a

similar status or performing similar functions) or employee (other than employees with a purely

clerical, administrative or support function, as designated by the CCO) of an Adviser, or any

other person who provides investment advice on behalf of an Adviser and is subject to the

supervision and control of such Adviser." Section II. As such, NSR Supervised Persons

included Saxena himself.

42.     NSR Advisors' Compliance Program required "NSR Supervised Persons to report

their personal securities transactions and holdings as described in the Code of Ethics," which

required that NSR Supervised Persons report to the CCO on their personal securities trading

initially upon becoming NSR Supervised Persons and at least once annually thereafter, as well as

report certain transactions on a quarterly basis. Appendix C to Compliance Program at Article

IV(A). The Compliance Program provided that "[s]ecurities holdings and transaction reports are

reviewed by the CCO who administers and monitors compliance with the Code of Ethics."

Section VII(E).

43.     NSR Advisors' Compliance Program generally prohibited officers and managers

of NSR from making or receiving loans to or from clients or prospective clients or from entering

into other transactions with clients. Among "Prohibited Business Practices," the Compliance

Program includes "[e]ntering into a transaction with a client, including the purchase or sale of

securities, or other property or services," and "[l]oaning money to or borrowing from a client,"

unless "the transaction or proposed course of action is approved in advance by the CCO or is

otherwise in the course of the Adviser's advisory services to clients and is consistent with this

Program." Section IV(A). Likewise, "[e]ngaging in any act, transaction, practice or course of

business which is fraudulent, deceptive or manipulative" is proscribed by the Compliance

Program. *Id.*

44.     NSR Advisors' Compliance Program also prohibits "making payments or giving

anything of value to a non-U.S. government official in order to induce such official to influence a

non-U.S. government (or instrumentality thereof) or to affect or influence any act or decision of

such government (or instrumentality)."  Section IX(D).  To prevent violations of this restriction, it requires that "NSR Supervised Persons must contact the CCO prior to initiating any dealings with any non-U.S. government official, non-U.S. governmental or quasi-governmental entity or representative to ensure that the proposed activity does not violate the [Foreign Corrupt Practices Act]."  *Id.*

45.     The Compliance Program further provides that "[i]t will be the duty of the CCO to prevent the violation of any applicable securities laws or this Program.  In addition, it is the CCO's duty to seek to detect any such violations and, if they occur, to take any necessary actions to prevent similar violations."  Section XIV(B).  The Compliance Program states that "[v]iolations of this Program or the Federal Securities Laws will be reviewed by the Adviser's management and the CCO for appropriate action and possible sanctions up to and including termination."  Section IV(D).

46.     The CCO's duties under the NSR Advisors' Compliance Program include "[s]erving as a liaison between [NSR Advisors], on the one hand, and the SEC and other regulators, on the other hand, for examinations and regulatory inquiries."  Section XIV(B)(20).

47.     The SEC requires that a CCO "be empowered with full responsibility and authority to develop and enforce appropriate policies and procedures for the fund."  *See Compliance Programs of Investment Companies and Investment Advisers*, Investment Advisers Act Release No. IA-2204 (Dec. 17, 2003), at http://www.sec.gov/rules/final/ia-2204.htm. (hereinafter "Release").  Therefore, the NSR Advisors Compliance Program also provides that the CCO is responsible for "[c]onfirming that NSR's senior investment professionals are monitoring each Adviser's portfolio management processes, including confirming that investments made by the Adviser are consistent with each client or fund's investment objective,

fund documents and side letters . . . . " Section XIV(B)(6).  The CCO is responsible for

periodically "check[ing] to confirm that each private fund is being managed in accordance with

its stated objectives" as set forth in the funds founding documents.  Section VII(A).

48.     Pursuant to these provisions, Gupta as CCO was responsible for ensuring that

NSR Funds' investments were consistent with their relevant disclosures and their governing

documents.

49.     The SEC has repeatedly stated that it is crucial that senior leadership at

investment advisors work with their CCOs in creating a "culture of compliance."  For example,

on June 29, 2015, in a speech entitled "The Role of Chief Compliance Officers Must be

Supported," former SEC commissioner Luis A. Aguilar discussed the culture of compliance as

follows:

> Chief Compliance Officers of Investment Advisers (CCOs) play an important and
> crucial role in fostering integrity in the securities industry. They are responsible
> for making sure that their firms comply with the rules that apply to their
> operations. As part of that effort, CCOs typically work with senior corporate
> leadership to instill a culture of compliance, nurture an environment where
> employees understand the value of honesty and integrity, and encourage everyone
> to take compliance issues seriously. CCOs of investment advisers (as with CCOs
> of other regulated entities) also work to prevent violations from occurring in the
> first place and, thus, prevent violations from causing harm to the firm, its
> investors, and market participants. Given the vital role that CCOs play, they need
> to be supported. Simply stated, the Commission needs capable and honest CCOs
> to help protect investors and the integrity of the capital markets.

Available at https://www.sec.gov/news/statement/supporting-role-of-chief-compliance-

officers.html.  Since then, the SEC has brought a number of enforcement actions against CCOs

of RIAs who turned a blind eye to the more lawless impulses of their bosses.  Gupta was

determined not to place his own reputation similarly at risk, but rather to enforce a culture of

compliance at the NSR Funds.

50.     By contrast, far from encouraging a culture of compliance, Saxena, assisted, enabled and covered-for by Dworkin and Riley, instead violated and ignored the Compliance Program and repeatedly undermined Gupta's efforts, as NSR Advisors' CCO, to ensure compliance at the NSR Funds and its advisors.  Gupta's responsibility to ensure compliance ultimately put him in conflict with Saxena, who insisted on skirting his compliance obligations and resented Gupta's efforts to prevent his doing so.  This conflict eventually ended with Saxena terminating Gupta's employment in retaliation.

### D.     From 2012 Through 2016, Gupta Insisted that Saxena Follow the Compliance Program, and Saxena Resisted Doing So

51.     Beginning from the time Gupta became CCO of NSR Advisors, Defendants stymied his efforts as CCO.  The crux of the tension between Gupta and Saxena was that Gupta took his job as CCO more seriously than Saxena, supported by Dworkin and Riley, wanted him to.

52.     Prior to 2012, the NSR Funds had operated outside the glare of regulatory scrutiny, and Saxena, Dworkin and Riley preferred to keep it that way.  In fact, around the time of the passage of Dodd-Frank, Saxena was actively exploring how to move the NSR Funds out of the United States precisely to avoid impending regulation.  But when that effort failed, NSR Advisors had to become an RIA under SEC jurisdiction.  Then Gupta, as CCO, had to assess how certain questionable acts by Saxena impacted the regulatory compliance of NSR Advisors and the NSR Funds under the Investment Advisers Act and related SEC Rules.  To do that, Gupta pressured Saxena, Dworkin and Riley to explain certain mysterious payments so that he could determine whether corrective action and/or disclosure was required.  Saxena, however, wanted to keep Gupta in the dark about those payments.  Gupta's refusal to just "go along" and

ignore compliance concerns led Saxena, Dworkin and Riley to label him "disloyal."

53.     The compliance issues that Gupta attempted to understand and manage mostly involved Saxena himself and fell into four main categories:

(i)     Saxena refused to follow procedures mandated by the Compliance Program;

(ii)    Saxena refused to permit proper disclosure of questionable financial transactions;

(iii)   Saxena continued to engage in questionable financial transactions despite Gupta's warnings; and

(iv)    NSR Advisors chronically failed to send audited financial statements of NSR Funds to the Funds' investors within the time required under SEC Rules.

Illustrative examples of these concerns are set forth below.

(i)     <u>Saxena Refused to Follow Compliance Procedures</u>

54.     The Compliance Program required "supervised persons" like Saxena to provide their personal trading records to Gupta as CCO in order to ensure compliance with SEC Rule 204A-1.  However, Saxena refused to provide them when Gupta demanded to see them. Likewise, Saxena neglected to obtain Gupta's pre-approval to trade listed stocks and make private investments; instead, Saxena arranged to have Riley "rubber-stamp" his desired trades. Similarly, Saxena, Dworkin and Riley consistently denied Gupta access to NSR Advisors' key financial records, so as to hinder and impede his ability to perform his duties as CCO pursuant to SEC Rule 206(4)-7 and NSR Advisors' Compliance Program.

(ii)    <u>Saxena Hindered Full Disclosure of Questionable Financial Transactions</u>

55.     Transactions that occurred before NSR Advisors became registered with the SEC

continued to have financial impacts in later years. In particular, financial transactions that had been improperly reported and/or disclosed would continue to infect the financial statements of the NSR Funds to the present, unless corrected. Gupta became particularly concerned about several such transactions.

56.     For example, from approximately 2008 through 2014, the NSR Funds had co-invested with Vedanta Opportunities Fund L.P. (the "Vedanta Fund"), a private equity fund managed by Vedanta Management. As noted above, Vedanta Management was also founded and controlled by Saxena. Gupta was concerned Saxena had not obtained Limited Partners Advisory Committee consent prior to making certain conflicted co-investments with the Vedanta Fund. Gupta was particularly alarmed by Saxena's failure to obtain such consent even when he was advised to do so. Moreover, Saxena admitted that he routinely did not obtain proper consent when co-investing across funds. Saxena's response to advice that he do so was, "why? We didn't for Augere [another investment]."

57.     Also, in 2011, the NSR Funds earned a $4.8 million profit on an investment in certain bonds, and Saxena had NSR Advisors deliver $4 million of it to an unknown entity. Saxena provided no explanation or accounting to Gupta for this diversion of funds. After Gupta became CCO, he pressured Saxena to fully disclose all the particulars of this transaction so that Gupta might make a proper assessment whether it complied with the Compliance Program, whether it was properly accounted for in the NSR Funds' financial statements, and what disclosures were due to the NSR Funds' investors. Despite Gupta's constant demands for such information, Saxena refused to provide any information, and he and Riley stone-walled any attempts by Gupta to unearth the facts behind it (this investment is further discussed at ¶¶ 74-80 below.

(iii)    <u>Saxena Continued to Engage in Questionable Financial Transactions</u>

58.    Saxena and Riley refused to provide Gupta necessary information about expenses that Riley recorded in NSR's books so that he could determine whether they were permitted under the Compliance Program.  These expenses, charged to NSR Advisors, included the costs of jets and cars not used for business purposes.  Saxena expensed shares in three corporate jets; several expensive cars, some of which were driven by his wife rather than Saxena; family ski vacations; professional fees for his personal investments; and, as reported to Gupta by Riley, an apartment in New York City that he rented as his personal residence but charged to NSR.

59.    Riley also reported to Gupta that in 2008 Saxena had borrowed $10 million or more from an investor in the NSR Funds, South Asia International Development Ltd., to buy an apartment at 15 Central Park West, New York, New York.  When NSR Advisors was being examined by the SEC in December 2016, Saxena, Dworkin and Riley refused to permit Gupta to respond truthfully to the SEC's information request item (number 19) that Saxena had borrowed money from an investor.  Saxena terminated Gupta a month after SEC's examination began, so Gupta does not know if this loan was ever disclosed as he had insisted it be.

60.    Saxena held his own stake in the NSR Funds through several Special Purpose Vehicles ("SPVs").  Those SPVs held approximately $27 million of commitments from people and entities other than Saxena.  Yet, Saxena claimed the full amount of the SPVs' commitments as his "own money" in reporting to the investors of NSR Funds how much "skin in the game" he himself had.  But according to a December 2008 email from Riley, Saxena's personal stake in the NSR Funds at that time was less than $9 million.  Gupta demanded accurate disclosure of Saxena's *actual* investment in the NSR Fund to the investors but Saxena

refused.  Gupta was terminated before that issue was resolved.

61.     Gupta also raised concerns about how certain management fees were calculated and management fee waivers calculated.  The financial results reported after Gupta's termination showed that Saxena and Riley sought to correct some of those errors.  Further, Gupta objected to NSR Advisors taking certain management fees from the NSR Funds for the second half of 2014, which required investors to remit more of their committed but unpaid capital because NSR Advisors had already taken fees for the period in question.  Gupta thought this amounted to Saxena fabricating management fees in order to raise cash from unwitting investors.

62.     Saxena also often took suspicious and unapproved distributions from NSR Advisors at will, essentially using the NSR Advisors' cash as his personal funds.  For example, on March 6, 2014, Saxena instructed Gupta to wire $2 million to his London Citibank account which, he said, "they were threatening to close."  Riley arranged for the wiring of the funds after Gupta refused.  On July 1, 2014, Saxena instructed Gupta to transfer $1.5 million from NSR Advisors to one of his personal accounts.  When Gupta refused to do so, Phil Shih, an employee of Vedanta Management reporting to Riley, transferred the cash instead and on July 14, 2014, wrote to Saxena and others, "It is done."  From just March through July, 2014, Saxena took over $6.6 million from NSR Advisors.  "I am not a crook," he later told Gupta, "but I decided to live large."

63.     On several occasions thereafter, Gupta demanded that Saxena account for all expenses accurately and to return all funds he had taken from NSR Advisors that were not properly authorized.  These steps were necessary to return NSR Advisors to compliance and to amend NSR Advisors' financial statements and tax returns to properly account for all affected

prior years.  Saxena refused to comply and asked Gupta to approve his personal expenses to be

deducted from company accounts.  Gupta refused and thereafter declined to sign tax returns

because he considered them inaccurate and possibly fraudulent.

(iv)    The NSR Funds' Chronically Late Audit Reports

64.    The SEC Rules require RIAs who have custody of non-certificated securities, as

NSR Advisors did on behalf of the NSR Funds, to deliver audited financial statements to their

investors no later than 120 days after the close of their fiscal year.

65.    For each of the years 2012 through 2017, the NSR Funds failed to meet that

deadline.

66.    Gupta repeatedly recommended self-reporting the delays to the SEC.  He was

always instructed by Saxena and others not to do so.

**E.    Gupta Becomes a SEC Whistleblower**

67.    These compliance failures required Gupta to determine that Saxena's compliance

performance was unsuitable and to elevate his compliance risk perception of NSR Advisors and

the NSR Funds.  These assessments required disclosure in an amended Form ADV, Part 2, for

NSR Advisors.  Instead of permitting the disclosures, Saxena pressured Gupta to change his risk

perceptions in his compliance reviews.  Saxena's blatant disregard of the Compliance Program,

and his pressure to whitewash his compliance violations, put Gupta himself at risk of SEC

sanctions if he did not do something about it, especially in light of Saxena's past SEC sanction

which itself raised a red flag for Gupta.

68.    Several times during the course of 2016, Gupta presented his concerns to Aaron

Deuser ("Deuser"), the only other board member of NSR Partners besides Saxena.  Deuser

promised to launch a full investigation by an independent law firm, but none ever took place.  A lawyer was identified, an engagement letter received and a fee negotiated, but the retainer was never paid to commence the investigation.  The reason for this failure was clear:  With only Saxena and Deuser on the board, it would be deadlocked if Saxena did not recuse himself, and Saxena never recused himself.

69.    Unable to achieve any progress by reporting his issues internally at NSR Advisors, in March 2016 plaintiff began reporting many of his concerns to the SEC by filing Forms TCR ("Tips, Complaints & Referrals") to its Whistleblower Office.  The Form TCR is the prescribed form for filing whistleblower information with the SEC for purposes of the whistleblower provisions of Dodd-Frank.

70.    On March 12, 2016, Gupta submitted TCR No. 1457822503293 to the SEC's Office of the Whistleblower.  In that TCR, Gupta reported and attached emails concerning "the lack of regard for separation between two affiliated funds at NSR/Vedanta."  The two affiliated funds referred to were the NSR Funds and the Vedanta Fund, managed by Vedanta Management, which Saxena also controlled.  Gupta supplemented that TCR with four others during the course of 2016, providing more detail.

71.    Gupta's concerns were substantiated by the 2016 SEC Order.  That Order summarizes its findings as follows:

> NSR's co-founder and CEO [Saxena] is also a co-founder and CEO of a different Commission-registered investment adviser to other private equity funds ("Adviser A") [Vedanta Management]. From approximately 2008 to 2014, the NSR Funds invested over $250 million in four portfolio companies in which another private equity fund managed by Adviser A (the "Related Fund" [the Vedanta Fund]) also invested.  These co-investments posed conflicts of interest for NSR.  To address such conflicts, the NSR Funds' Limited Partnership Agreements required the consent of the NSR Funds' advisory boards for the NSR Funds to co-invest with

the Related Fund.  Contrary to this requirement, NSR negligently failed to obtain
the required advisory board consents for the NSR Funds' co-investment with the
Related Fund that were made from January 2008 through April 2014.

2016 SEC Order at 2.  In its detailed findings, the 2016 SEC Order specifically mentioned the

co-investment by the NSR Funds and the Vedanta Fund in Augere ("a portfolio company

operating in the telecommunications sector in countries on the Indian subcontinent," *id*. at ¶ 13)

and that the NSR Funds covered the Vedanta Fund's share of a capital call.  Gupta had raised

questions as to this issue internally (see ¶ 56 above) and in his TCRs.  The SEC imposed a

sanction of $275,000 on NSR Advisors for is violations.

72.    On October 2, 2016, Gupta submitted TCR No. 1475463761301 to the SEC's

Office of the Whistleblower.  In that TCR, Gupta reported that "NSR Funds audits have been late

for the last 5 years and I have been asking [the NSR Funds' counsel] for the past several years if

I have any obligation to report the delays and each year they tell me no."  On October 4, 2016,

Gupta submitted TCR No. 1475638834890 to the SEC's Office of the Whistleblower, in which

he reiterated "For the past 5 years NSR Funds audits have not met the 120 days' timeline.  Each

year, since NSR's registration the delays are getting worse.  As NSR's CCO, I wanted to report

this recurring delay to the SEC but have been shut down . . . ."

73.    Gupta's concerns were substantiated by the 2018 SEC Order.  That Order found

specifically that NSR Advisors had violated SEC Rule 206(4)-7 by failing "to timely distribute

annual audited financial statements to the investors of the NSR Funds" for each fiscal year from

2012 through 2017, and SEC Rule 206(4)-2 by failing to correct the processes that led to those

chronic delays.  2018 SEC Order ¶¶ 1, 10, 11.  Those were the same issues that Gupta had raised

internally at NSR Advisors (see ¶¶ 64-66 above).

74.    On June 29, 2016, Gupta submitted TCR No. 1471439559188, and on September

16, 2016, TCR No. 1474002049567, to the SEC's Office of the Whistleblower.  In those TCRs, Gupta reported that in 2011, the NSR Funds earned a profit of $4.8 million when a $14.35 million investment in foreign currency convertible bonds of Sical Logistics Limited matured, returning proceeds of $19.1 million (the "Sical Transaction").  Gupta reported that no such gain was ever booked to the NSR Funds.  Instead, he reported that $4 million dollars had been wired to an unknown company called Welland Investments, and that he had been ordered to cease his inquiries into that money transfer.  As recently as May 2016, Gupta had tried to obtain workpapers about that transaction from the NSR Funds' outside auditors, E&Y, and Riley (probably on Saxena's orders) shut down the inquiry.  "Spoke to the EY partner," Riley wrote on May 19, 2016.  "Told her that Re: the Rishi request for work paper information relating to 2011, that it was not necessary to respond.  NSR was handling this matter internally."  Gupta never received the documentation he requested.

75.     Gupta's concerns about the propriety of that payment are now being substantiated in the news.  At the time of the transfer, V.G. Siddhartha, a personal friend of Saxena and the founder of Café Coffee Day, India's popular counterpart to Starbucks, personally urged Saxena to order Gupta to transfer that $4 million per Siddhartha's instructions, but Gupta refused.  After several attempts to route the payment through a tax-advantaged entity, the money was ultimately paid to an unknown entity called Welland Investments.

76.     Gupta was concerned about this payment because it was shrouded in mystery—no one knew anything about Welland Investments—and also because Siddhartha's father-in-law, S.M. Krishna, was then India's Minister of External Affairs and a senior member of the Indian National Congress, India's then-ruling party.  Those facts raised in Gupta a concern that the payment ran afoul of anti-money laundering statutes and the Foreign Corrupt Practices Act

("FCPA").  That concern was heightened by Saxena's occasional statements to Gupta that he "didn't want to know" about where that money went, because "the answer is bad."

77.     On July 31, 2019, Siddhartha committed suicide in India, a much-publicized event.  He and his businesses are being investigated by Indian tax and law enforcement authorities, who allegedly found undisclosed transactions and illegal income.  *See*, *e.g.*, India's 'Coffee King' Found Dead Amid Financial Troubles, *The New York Times* (July 31, 2019), available at https://www.nytimes.com/2019/07/31/business/india-vg-siddhartha-dead-cafe-coffee-day.html.  Since then, other investigations of Siddhartha's business dealings have been commenced by law enforcement authorities in several countries.  It has also been reported in the press that the Indian tax and enforcement authorities raided Siddhartha's premises in September 2017 and found hidden cash and records of questionable transactions.  According to these press reports, the authorities linked Siddhartha to D. Shivakumar, a high-ranking member of the Indian National Congress who was taken into custody and awaits further proceedings.

78.     According to press reports, on August 8, 2019, Café Coffee Day appointed E&Y to investigate all transactions pertaining to Siddhartha, Café Coffee Day and related entities. However, it was later reported that on August 30, E&Y was replaced due to "conflict issues." E&Y was also replaced as the auditors of the NSR Funds.  E&Y still holds accountants' workpapers detailing the NSR Funds' transfer of that $4 million to an entity tied to Siddhartha, which would cause a conflict were it now to investigate Siddhartha and his companies.

79.     In 2016, Saxena admitted to Gupta that the NSR Funds' entire investment in the Sical Transaction had been in some unclear way for Siddhartha's benefit, and that "explained" why the bulk of the profit had been sent in 2011 as Siddhartha demanded.  However, that did not resolve the accounting and compliance issues faced by the NSR Funds on account of this

questionable transaction. Gupta never received satisfactory explanations, and had no recourse but to report the facts as he knew them to the SEC in order to protect himself from being complicit in what he believed were securities law violations.

80.     Gupta was also concerned about insider trading in connection with the Sical Transaction. Café Coffee Day was acquiring Sical Logistics around the time of Sical Transaction, and Saxena was a member of the Café Coffee Day board of directors. The Sical Transaction returned a 35% profit in only seven months, so large that Gupta suspected insider knowledge in making the trades. Gupta's concerns were dismissed, and he was told not to pursue them.

**G.     Defendants Believed Gupta Was a Whistleblower**

81.     Because of Gupta' insistence on compliant behavior, Defendants accused Gupta of being a whistleblower long before he actually became one. Saxena, especially, began to suspect Gupta of disloyalty soon after he became CCO.

82.     For example, as early as 2014, Saxena openly accused Gupta of secretly providing confidential information to a limited partner, Wibbert Investment Co. ("Wibbert"). In 2013, Wibbert sued Saxena, among others, alleging overcharges of management fees and related expenses and other breaches of fiduciary duty. When Wibbert sought to take Gupta's deposition in that case, Saxena claimed that Wibbert would only do so if Gupta had provided it information. Gupta had not, but Saxena believed he had and so accused him.

83.     Similarly, in 2015 Saxena told Gupta that people at NSR thought he had been leaking information to former NSR partner Rajat Gupta, with whom Saxena had ongoing (and well-publicized) conflicts. In October 2015, Saxena asked Gupta if he was "on Rajat's payroll." And when the SEC investigated in 2016 whether Rajat Gupta, by then a convicted felon, still

maintained an association with NSR Partners, Saxena asked Gupta, "Are you behind it?" clearly

implying that he believed Gupta had instigated the investigation.  Thereafter, Saxena prohibited

Gupta from communicating with the SEC in conjunction with that or another examination, a role

specifically delegated to him as the CCO in the Compliance Program.

84.     On December 1, 2016, the SEC's Office of Compliance Inspections and

Examinations initiated an examination into NSR Advisors based on Gupta's whistleblower

report that the NSR Funds' audits were chronically late and other matters, which ultimately led

to the 2018 SEC Order.  Saxena by then became convinced that Gupta had instigated the

examination and took active measures to prevent Gupta—even though he was CCO—from

interfacing with the SEC.  To ensure SEC's examiners never met with Gupta, Saxena, Dworkin

and Riley pushed back SEC's field visit and in-person meetings at NSR to January, 2017.  It was

their intent to terminate Gupta right after the Christmas holidays, in retaliation for being a

whistleblower and also to prevent him from being interviewed by the SEC.  And, in fact, the

SEC exam team never got to meet with Gupta.

**H.     Defendants Retaliate Against Gupta**

85.     The sequence of events that led directly to Gupta's termination intensified on

September 15, 2016.  In an email to Deuser that day, Gupta declared Saxena's compliance

"unsuitable" because of his consistent failure to follow and abide by the Compliance Program.

Gupta urged the board to take appropriate remedial measures, and also informed the board

that his finding could be a material disciplinary action reportable to investors on NSR

Advisors' Form ADV Part 2B.

86.     In response, on October 2, 2016, Saxena, instead of recusing himself as he

should have, wrote to the plaintiff:

I am hereby instructing you that before you make any regulatory filing, including amendments to the ADV, I am directing that you to circlate [sic] it to Scott Moerhke of Kirkland and Andy [Dworkin] so they can provide feedback and help finalize these matters.

87.     On October 3, 2016, Saxena told Gupta, "I shouldn't have let you be in [the CCO] position.  You should have been deputy controller or you shouldn't have been here."

88.     On October 28, 2016, Saxena told Gupta, "I would make sure you stay if I thought you were loyal to the organization," and that Gupta had "taken things too far, quite far."

89.     On November 4, 2016, Saxena told Gupta, "I should never have given a job like [CCO] to you."

90.      On November 5, 2016, Saxena learned that Gupta had been reviewing emails as part of his compliance function as CCO and immediately cut off Gupta's access to email system, thereby preventing him from fulfilling his CCO's obligation to review emails.

91.     On November 30, 2016, Saxena told Gupta, "you were a contractor (in 2008), we should've got rid of you at that time."

92.     On December 1, 2016, the SEC began the examination that led to the 2018 SEC Order.

93.     On December 12, 2016, Saxena asked Gupta, "why do you have so much hatred in your soul?" and accused Gupta of "sharpening the knife to stab [Saxena] in the back." Saxena also said, "you for reasons I don't understand are making a mountain out of something that is not even a mole hill.  Why you are doing that baffles me.  Completely baffles me.  I don't understand the motivation.  What is he trying to do, is he trying to ruin the firm, trying to ruin me?  Trying to ruin me, ok, that I understand but why trying to ruin me, that I don't understand."

94.     Finally, on January 5, 2017, Defendants perfected their retaliation against Gupta by terminating his employments with NSR Advisors and NSR Partners, his directorships with the Relief Defendants, and his compensation.  Saxena personally fired Gupta.  Gupta was terminated in the first hour of reaching the office after the Christmas holiday break.

95.     Saxena told Gupta that he was being terminated as part of a workforce reduction. Purportedly several other people were also being terminated at the same time, although Gupta was the only employee from the New York office and one of only two from NSR's United States operations.

96.     The purported reason for Gupta's termination was a pretense.

97.     The NSR Funds were still active and still needed to have a full-time CCO.  In fact, Riley was named CFO and CCO in Gupta's place immediately following his termination and still occupies those positions.

98.     Moreover, the other persons terminated at the same time as Gupta had been identified as unneeded Investment Professionals by Gupta himself three years earlier, in January 2014. But Saxena never acted to terminate their employment until it was convenient to do so as a cover for firing Gupta.

99.     This pretense was later confirmed to Gupta by Abdul Hafeez Shaikh, a co-founder and partner of the NSR Funds (and the current Finance Minister of Pakistan), who has personal knowledge of the facts.  Shaikh confirmed to Gupta that he was fired along with others in order to mask Saxena's retaliatory intent.  At various times, Shaikh told Gupta that:

(a)     Saxena "was just waiting for the opportunity" to get rid of Gupta, and that "the only way they could do it was by combining [Gupta's] termination" with that of other employees.

(b)     Saxena, "thought of [Gupta] as a pain in the ass, as a kind of thorn.  When they

got the chance, they fired [Gupta] along with others."

(c)     "they [Saxena, Riley and Dworkin] will be tricky.  They will say we fired him

[Gupta] but we fired Anand [another terminated employee] also . . . .  But judges

can figure out they did it in a tricky way."

(d)     "for them, practically, [combining Gupta's termination with others' was] the only

way they could do it.  If they had to fire you on your own their defense will be

less easy than now in their mind.  And that's a fact also."

100.     Saxena also told others that Gupta had to be terminated because he "had gone to

the dark side" and had become "too much of a threat."

**I.     Defendants' Retaliation Has Damaged Gupta**

101.     Plaintiff has suffered extensive damages as a result of the retaliation against him

by NSR.

102.     Gupta has lost his livelihood.  Since his termination by NSR Advisors, he has

been unable to find and keep comparable employment.  Being older, his opportunities are

limited.  Moreover, Gupta lost at least one job prospect when the SEC Orders surfaced in a

background check, and the prospective employer determined that Gupta's role as CCO when the

SEC sanctioned NSR Advisors made him too great a risk.

103.     Even before he was terminated, starting in at least 2012, Gupta was denied

compensation suitable for a CCO of funds the size of the NSR Funds.

104.     Based on reports from his industry peers, Gupta had known that the market range

of compensation for CCOs of funds comparable to the NSR Funds is much higher than what

Gupta was being paid.  Gupta raised the matter of his compensation with Saxena numerous times

and with Shaikh as well.  But, in his continuing retaliation against Gupta, Saxena failed to address Gupta's legitimate grievances, and never paid Gupta in the range of compensation that his position warranted.

105.    In 2014, Saxena commissioned a compensation study.  On March 8, 2015 Saxena demanded Gupta send him an email, which Saxena dictated, approving his bonus of $2.3 million for the calendar year 2014 (on top of his salary of $400,000) based on the compensation study. Gupta refused to do so without seeing the study, but Saxena would not show it to him.  Gupta believes that compensation study corroborated what he knew from industry knowledge, and that Saxena would not show him the study so as not to admit Gupta's legitimate claim for fair market compensation.

106.    In addition to loss of compensation and employment, Gupta, a cancer survivor, suffered severe health damage and emotional distress due to the Defendants' conduct and ill treatment.

## CLAIM FOR RELIEF

### (Retaliation in Violation of the Dodd-Frank)

107.    Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 106 above as if fully set forth herein.

108.    At all times material hereto, the Dodd-Frank was in effect and binding on NSR Advisors and the Defendants.  Dodd-Frank prohibits employers from discharging, demoting, suspending, threatening, harassing (directly or indirectly), or in any other manner discriminating against whistleblowers in the terms and conditions of employment because of any lawful act done by the whistleblower in providing information regarding potential securities law violations to the SEC.  Dodd-Frank permits aggrieved whistleblowers to bring an action in United States

District Court for relief.

109.    By virtue of the foregoing, Gupta is a whistleblower within the meaning of Dodd-Frank.

110.    By virtue of the foregoing, NSR Advisors, NSR Partners, Saxena and the Entity Control Defendants unlawfully retaliated against Gupta in connection with his performance of activities protected by Dodd-Frank.

111.    Accordingly, Gupta is entitled to remedies as provided by Dodd-Frank.

## RELIEF DEMANDED

Plaintiff therefore demands judgment against Defendants as follows:

A.    Double back pay with interest, including wages, medical benefits, and other employment benefits, bonuses, and all other forms of compensation, in an amount to be determined at trial, but believed to be not less than $9.2 million, all as provided for by Dodd-Frank;

B.    Reinstatement in his position as CCO of NSR Advisors, as corporate secretary of NSR Partners, and as director of each of the Relief Defendants;

C.    Or, in lieu of reinstatement in his positions, forward pay in an amount to be determined at trial, but believed to be not less than $3.6 million;

D.    Other compensatory damages as required to make him whole, in an amount to be determined at trial, but believed to be not less than $12.8 million;

E.    Punitive damages to the fullest extent permitted by law;

F.    Interest, including prejudgment interest, on all amounts awarded, calculated at the legal rate and in the appropriate manner;

G.      The costs and disbursements of this action, including reasonable attorneys' fees

and disbursements as provided for by Dodd-Frank; and

H.      For such other and further relief as the court deems just and proper.

Dated:      New York, New York
            October 7, 2019

STERN TANNENBAUM & BELL LLP

By:_____

      Aegis J. Frumento, Esq. (AF-7619)
      Stephanie Korenman, Esq. (SK-0447)
380 Lexington Avenue, 33rd Floor
New York, New York  10168
(212) 792-8979
(212) 792-8980
afrumento@sterntannenbaum.com
skorenman@sterntannenbaum.com

                        *-and-*

THE GALBRAITH LAW FIRM

By:_____
      Kevin D. Galbraith, Esq. (KG-7512)

By:_____
      Christopher D. Warren, Esq. (CW-3630)
236 West 30th Street, 5th Floor
New York, New York 10001
(212) 203-1249
kevin@galbraithlawfirm.com
chris@galbraithlawfirm.com

*Attorneys for Plaintiff Rishi K. Gupta*